MYRON G. SAMMONS AND DOROTHY SAMMONS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Sammons v. Commissioner
Docket No. 21133-82.
United States Tax Court
T.C. Memo 1986-318; 1986 Tax Ct. Memo LEXIS 292; 51 T.C.M. (CCH) 1568; T.C.M. (RIA) 86318; July 28, 1986; AFFIRMED IN PART AND REVERSED IN PART January 27, 1988 *292 Petitioner husband paid $12,000 for a race horse which was never delivered. Efforts by petitioner and his attorney in 1977 to obtain delivery of horse or recovery of payment established that horse would not be delivered or money recovered. Held, under California law where horse was purchased theft includes loss by embezzlement and petitioners are entitled to a theft loss deduction under section 165. In 1977, petitioner gave two art dealers $140,000 with which to purchase for him a specific collection of Indian artifacts and deliver collection to a museum. Later petitioner discovered that the dealers paid only $60,000 for collection and demanded that the situation be rectified. Accordingly, dealers purchased and delivered more artifacts until they had spent almost all of the $140,000. All of the artifacts, some of which contained hawk and eagle feathers and parts, were delivered to museum by March 30, 1977. On December 6 petitioner told curator by telephone he wished to make gift last of month and in January 1978 curator gave him receipt dated December 30, 1977. Held,further, (1) the dealers were petitioner's agents and petitioner acquired title to all the artifacts because their *293 purchase was within the scope of the agency; (2) even if the purchase of the items containing hawk and eagle parts violated Federal statute, such violation did not prevent the transfer of title to petitioners nor from petitioners to museum; (3) donation was completed on December 30, 1977; (4) expert appraisals are not acceptable at face value -- one because of lack of independence and others because appraisals were made from photographs from which authenticity, age and condition of many items could not be determined; and (5) value of donation is $140,000 because the most reliable evidence of the fair market value of artifacts was the amount paid by petitioner. Held,further, petitioners are liable for the addition to tax for negligence provided by section 6653(a) because reliance, by petitioner husband, an intelligent, successful and prudent businessman, upon appraisals of over $500,000 for items which he paid only $140,000 was not the act of a reasonable and ordinarily prudent person. James Powers and Marc L. Spitzer, for the petitioners. David W. Otto, for the respondent. SHIELDS
MEMORANDUM FINDINGS OF FACTS AND OPINION SHIELDS, Judge: Respondent determined deficiencies in and *294 additions to petitioners' Federal income tax as follows: Additions to Tax
Year
Deficiency
Section 6653(a) [1]
1977
$140,659.72
$7,032.98
1978
95,853.94
4,792.69
1979
165,546.60
8,277.33
After concessions, the issues for decision are: (1) whether petitioners are entitled to a deduction for the nondelivery of a race horse for which they paid $12,000; (2) whether petitioners are entitled to a deduction for a contribution to Pacific Northwest Indian Center, and if so, the amount of such deduction; and (3) whether any part of any deficiency due from petitioners is attributable to their negligence or intentional disregard of rules and regulations within the meaning of section 6653(a). FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by reference. Petitioners, Myron G. and Dorothy Sammons, are husband and wife. For the years 1977, 1978 and 1979 they filed joint income *295 tax returns with the Internal Revenue Service Center at Ogden, Utah. For several years prior to the end of 1976 they lived in Missoula, Montana, where Myron G. Sammons ("Sammons") owned and operated a trucking business which he sold at a substantial profit in September 1976. Petitioners moved from Missoula to Scottsdale, Arizona in late 1976 and continued to reside there throughout the years in issue and at the time they filed their petition herein. In November 1976, Sammons met Joe Shearer at the Santa Anita Race Track in Los Angeles to examine some thoroughbred race horses which Shearer was offering to sell as agent for an undisclosed owner. During the meeting, Sammons gave Shearer a check for $32,000 of which $20,000 was in payment for a race horse named "Wind Marhiai" and $12,000 was in payment for a second unnamed race horse. Early in 1977, Shearer delivered Wind Marhiai to Sammons. The second race horse was never delivered. After some delay Sammons concluded that Shearer had no intention of delivering the second horse and attempted to contact Shearer at Santa Anita and later at the Bay Meadows Race Track in San Francisco. Being unsuccessful in these attempts, Sammons instructed *296 his attorney Ralph Wright to take whatever legal action was necessary in order to recover the $12,000. Wright's efforts also proved unsuccessful, and after consultation with him in 1977, Sammons concluded the second horse would never be delivered, any further action was useless, and the $12,000 could not be recovered. From 1966 through the years in issue, the Pacific Northwest Indian Center, Inc. ("Indian Center") operated a museum in Spokane, Washington known as the Museum of Native American Cultures ("MONAC"). The museum features exhibits and collections of Indian artifacts which portray the history and culture of North American tribes. Wilfred P. Schoenberg ("Schoenberg"), a Jesuit priest and the founder of the Indian Center, was serving in 1977 as its president and as the curator of MONAC. Throughout 1977, the Indian Center was recognized by respondent under section 170(c) as a qualified charitable organization exempt from taxation under section 501. Schoenberg made a practice of encouraging investors to buy artifacts and contribute them to the Indian Center. He distributed letters outlining tax writeoffs for the contribution of property where the fair market value of the *297 property on the date of its contribution was greater than its cost. His letters to potential donors included statements to the effect that fair market value meant the highest price that "someone, somewhere" would offer for an object. In January of 1977, Schoenberg became aware that a collection of Indian artifacts known as the Stuart Collection was owned by Joan Berry ("Berry") [2] who lived in Kalispell, Montana, and that the collection might be available for contribution to the Center. This collection consisted of a number of artifacts, primarily from the Plains and Plateau Indians. It included painted buffalo hides, buckskin clothing, medicine pipes, war bonnets, snow shoes, bayonets (presumably taken in battle), baby carriers, human scalps, horse tails, medicine rattles made from buffalo scrotums, cradle boards, bone tools, such as elk bone hide scrapers, and numerous other items. The most significant item in the Stuart Collection was a rare Blackfoot medicine pipe bundle known as a "thunder pipe." It contained a number of items wrapped together in a single hide or bundle. Among the items were a sacred *298 medicine pipe, various medicine bags, an ermine pelt, the bodies of two weasels, an effigy head of a crane, a bone dance whistle, deer bones, a feather bundle with hawk bells, other feathers, medicine wands used for gambling, braided sweet grass, a child's buckskin moccasin with medicine stones inside, a flute made from a rifle barrel and other artifacts. Thunder pipes generally have important religious significance to members of the Blackfoot tribe. It is believed that they embody great power for the tribe, as well to as any individual who is the "holder" of a pipe. The pipes are used ceremoniously during the first thunderstorm in the spring of each year, as well as on feast days specifically honoring the pipes. Each holder has the perogative, after appropriate fasting and inspiration, of adding items to his bundle. In keeping with a thunder pipe's religious function and to keep it from being desecrated, it is traditionally passed from one holder to another during a special ceremony. The Stuart who originally assembled the collection which bears his name was a policeman on a Blackfoot reservation and allegedly acquired his thunder pipe from a Blackfoot Indian in the 1930's without *299 the traditional ceremony, but fearing for the health and well-being of the Indian who had improperly passed the pipe, fellow tribesmen surrounded Stuart's house and demanded that a proper pipe-passing ceremony be performed. Thereupon a feast was prepared and the pipe was ceremoniously passed to Stuart. Nevertheless, several years later Stuart purportedly disregarded its ceremonial purposes and unwrapped the bundle to display its contents in a gift shop which he owned. Shortly thereafter, he broke his leg, developed a very painful infection and died. His widow, Laura Stuart, sold the thunder pipe to Joan Berry, passed it to Ms. Berry without a proper ceremony, and within a month choked to death while dining with fridends. In 1977 Joan Berry still owned the pipe and the balance of the Stuart Collection. Upon learning of the possible availability of the Stuart Collection Schoenberg contacted Dolores Swanberg ("Swanberg"), an art dealer in Kalispell, and believed by Schoenberg to be an acquaintance of Berry. They discussed generally the Indian Center's "local system for tax write-off gifts." By letter dated January 26, 1977, schoenberg advised Swanberg of the availability in her *300 area of a certain collection of Indian artifacts with a "possible fair market value appraisal of $500,000," which appraisal could be provided by a group of appraisers that the Indian Center had organized for this purpose. He further stated that the collection was available at a price "reasonable enough to attract investors." Schoenberg was referring to the Stuart Collection. Swanberg told Connie Jo Dalby ("Dalby"), another Kalispell art dealer, that Schoenberg was interested in obtaining the Stuart Collection for the Indian Center. Dalby telephoned Schoenberg and was also told by him that the Stuart Collection could be appraised at $500,000. At this point, Dalby and Swanberg became partners or joint venturers for the purpose of locating an individual to purchase the Stuart Collection and contribute it to the Indian Center. After unsuccessfully contacting several attorneys and accountants in Montana about a possible purchaser Dalby, in early February of 1977 contacted Jack Dobbins ("Dobbins"), a C.P.A. with offices in Missoula and inquired whether he had a client who would be willing to invest $140,000 to acquire an artifact collection which could be contributed to a museum at an *301 appraised value of about $500,000. Dobbins told Dalby that he would consider the matter. At about the same time Sammons in Scottsdale was informed by his attorney, Ralph Wright, that he had learned of a "tax shelter" involving a collection of Indian artifacts which could be bought for about $140,000 and donated to the Indian Center at an appraised value of $500,000.Sammons instructed Wright to discuss the proposed transaction with his accountant, Jack Dobbins. In doing so, Wright learned that Dobbins had already been contacted about the collection by Dalby. Wright and Dobbins then advised Sammons that the proposed purchase of the collection for $140,000 and its contribution to the Indian Center at $500,000 appeared to be an appropriate transaction for Sammons and his wife. Sammons then instructed Dobbins and Wright to contact Dalby and proceed with the transaction. In the meantime, Swanberg had approached Berry with an offer to purchase the Stuart Collection for $125,000. Berry, however, refused to sell at that figure because, according to Berry, she had just received two appraisals of the Stuart Collection which did not justify a sales price of $125,000. Further negotiations *302 resulted in an agreement by Swanberg to purchase the collection from Berry for $60,000. On February 9, 1977, Dobbins paid Dalby $140,000 and in return was given a receipt which reads as follows: "THE UNDERSIGNED does hereby acknowledge receipt of the sum of ONE HUNDRED FORTY THOUSAND AND NO/100 DOLLARS ($140,000.00) from MYRON G. SAMMONS and DOROTHY SAMMONS, As Tenants in Common, with an express 60% ownership in Myron G. Sammons and an express 40% ownership in Dorothy Sammons, the same representing payment in full for the purchase of that certain art collection herein known as THE STUART COLLECTION. Upon receipt of this payment, the said Stuart Collection will be transported to the Northwest Indian Center, operated by the Museum of Native American Cultures in Spokane, Washington, where it will be held in safekeeping and on loan by the Sammons family, and where a full and complete inventory and photographs of said Collection will be made, and copies of said inventory and photographs will be provided to Myron G. Sammons and Dorothy Sammons within thirty (30) days from the date hereof. DATED this 9th day of February, 1977. /s/ Connie Jo Dalby The next day, February 10, 1977, Swanberg *303 gave Berry a cashier's check for $60,000 in full payment for the Stuart Collection with the understanding that Berry would deliver the collection to the Indian Center. The delivery was made by Berry on February 24 and on February 26, 1977, Sammons wrote Schoenberg as follows: My wife and I are the owners of a substantial collection of Indian artifacts, which you may find desirable as an exhibit in your museum. * * * The collection is very expensive to insure and preserve; and for this reason, we would be willing to loan it to the museum and allow it to be exhibited as long as the museum would guarantee to maintain insurance for the appraised value of the collection and guarantee to keep the collection in a suitable environment to safeguard and preserve the ancient leathers, inks, dyes, and other organic parts of the individual pieces. We would, of course, expect the museum to provide us with an appraisal for determining the amount of the insurance necessary to insure the collection. If the museum would be in agreement to the above terms and conditions and would like to exhibit our collection, please contact me at our Scottsdale address. Apparently in reply to Sammons' letter of February *304 26, Schoenberg on March 9 wrote Dalby that the Stuart Collection was in his museum vault and was being carefully guarded and covered by insurance. [3] He further stated that "[w]hile it will take many days to assess the exact value of this collection, it appears at this point that the total value will be $500,000. [4] I trust that this will reassure your client." At about this same time Sammons learned in Scottsdale from one of his employees that the Stuart Collection which he had just purchased had, by a remarkable coincidence belonged to Berry, an acquaintance of his in Montana. Having also been informed that the price he paid might have been inflated he called Berry. Upon learning from her that she received only $60,000 for the collection for which he simultaneously had paid $140,000 Sammons *305 concluded that he "got took." Immediately thereafter, Sammons telephoned Dalby and informed her in a few words that he had learned how much she paid for the Stuart Collection, that he thought the collection was not as valuable as Swanberg and Dalby had indicated, and that he expected her to "do something about it." Dalby, being extremely unnerved and shaken by her conversation with Sammons, contacted Swanberg and with her help and financial assistance purchased through Mannie Moore, the co-owner of an Indian art gallery in Rollins, Montana, a collection known as the Flathead Trading Post Collection. The Flathead Collection consisted of artifacts of the Indians of the Northern Plains and a collection of stone tools and weapons. Dalby and Swanberg paid $45,000 for Moore's collection and delivered it to MONAC on March 23, 1977. After receiving the Flathead Collection, Schoenberg advised Dalby and Swanberg that the combined value of the Flathead Collection and the Stuart Collection was less than $500,000 and suggested that they obtain and deliver additional artifacts so that the total appraised value would exceed $500,000. Pursuant to his suggestion, Dalby and Swanberg obtained additional *306 items from their own collections and from others and delivered them to Schoenberg. The additional items, the cost of which almost consumed but did not exceed, the balance of the $140,000 which Swanberg and Dalby had received from Jack Dobbins, included Indian pipes, a German furtrader's silver collection, a collection of Indian photographs and various archaeological pieces. All of the items were delivered to the Indian Center and placed in its vault by March 30, 1977. By letter dated April 2, 1977, Schoenberg advised Sammons that MONAC had received a collection of artifacts with a fair market value in excess of $500,000. In June 1977, Schoenberg had all of the artifacts in the collection inventoried and individually photographed. In July and August 1977, he had them appraised by Walter Crawford, Patsy Converse Bates, and Stu Barrett. Crawford concluded that the collection had a total fair market value of $540,185. Bates' appraisal was $548,380. The amount of Barrett's appraisal is not in the record. For their services the appraisers received no remuneration determined by reference to the amounts of their appraisals. However, each of the appraisers received, either free of charge *307 or by way of discounted value, artifacts deaccessioned [5] by the Indian Center. By letter dated September 2, 1977 Schoenberg forwarded to Sammons copies of the appraisals, photographs of the artifacts, a copy of the museum's form letter containing tax deduction information, and an undated receipt reflecting a contribution of the artifacts to the museum which receipt according to the letter was "to be signed and dated at the appropriate legal time." The letter concluded as follows: Mostly I want to thank you. Formalities of ownership are not complete, I know, but we truly appreciate what you have already done. Be assured that if any question on values arises, we will back you up with legal and anthropological support. If and when you are interested in additional tax investiments please let me know. Many collections and items come to our attention. On December 6, 1977, Sammons telephoned Schoenberg and stated that he and his wife wished to make a gift to the Indian Center of all of their artifacts then stored in MONAC's vaults with the gift being effective *308 as of "the last part of the month." On January 26, 1978 Schoenberg sent Sammons a receipt dated December 30, 1977. The receipt recited that a contribution had been made by the Sammonses to the Indian Center of the following: The Stuart Collection The Mannie Moore Collection from the Flathead Lake Museum The Connie Dalby Collection A German Silver Collection A Collection of Photographs and Manuscripts A Stone Collection from the Flathead Lake Museum Prehistoric Ivory and Bone Artifacts Archeological Treasures from the Swanberg Collection From January 1, 1978, the collection of artifacts which contained 447 items was known as the Myron G. Sammons Collection. It was displayed as part of MONAC's exhibits and in furtherance of the Indian Center's charitable purposes. However, between January 1978 and January 1983, MONAC deacessioned many items in the Sammons Collection until by January 1983, only twenty items, including the thunder pipe, remained. On their 1977 income tax return, petitioners claimed a deduction for a theft loss of $11,900 ($12,000 less the $100 deductible) with respect to the race horse which was never delivered. They also claimed a deduction for a contribution to the *309 Indian Center of $548,380 which, because of annual limitations, was limited to $192,108 in 1977 and carried over into 1978 and 1979 in the respective amounts of $164,027 and $192,245. Respondent disallowed both deductions for lack of substantiation and determined that petitioners are liable for additions to tax under section 6653(a) because their deficiencies in tax are attributable to negligence or the intentional disregard of applicable rules and regulations. OPINION Theft Loss
During 1977 petitioners paid $12,000 for a race horse which was never delivered. Petitioners were unable to recover the $12,000 or find the individual to whom it was paid. Under section 165(c)(3), an individual is permitted to deduct a theft loss to the extent that the amount of such loss exceeds $100. The deduction includes losses by embezzlement. Section 1.165-8(d), Income Tax Regs. Section 503 of the Penal Code of California, where the loss occurred, defines embezzlement as the fraudulent appropriation of property by a person to whom it has been entrusted. The burden of establishing both the existence of the theft and the amount of the loss in on petitioners. Welch v. Helvering,290 U.S. 111 (1933); *310 Rule 142(a). Respondent contends that petitioners have failed to substantiate that a loss occurred or if so, the amount thereof. We disagree. Mr. Sammons testified in a candid, credible and forthright manner concerning the purchase from Shearer of the two horses, one for $20,000 and one for $12,000, the payment of the $32,000, the nondelivery of the second horse and his unsuccessful efforts and those of his attorney to find Shearer in order to receive delivery of the horse or recover the money. Shearer's appropriation of the $12,000 constituted an embezzlement under California law, and theft under section 165(c)(3) includes embezzlement. Consequently, petitioners are entitled to a loss deduction in the amount of $11,900. Contribution to Indian Center
With respect to this issue the parties agree that during 1977 the Indian Center was qualified under section 170 to receive tax deductible contributions. The parties also agree that such a contribution can be made in property. They disagree in this case as to the property actually contributed and the value of such property. These are questions of fact on which petitioners have the burden of proof. Welch v. Helvering,290 U.S. 111 (1933). *311 Respondent first contends that petitioners did not acquire title to all of the 447 items which were delivered to MONAC because Dalby and Swanberg were only authorized to purchase the Stuart Collection for Sammons and that the "moral obligation" which compelled them to purchase and transfer the additional artifacts was not sufficient to place title to the additional items in Sammons. Petitioners contend that the scope of the agency was to acquire artifacts that would be appraised by Schoenberg's appraisers at $500,000 for purposes of obtaining a deduction and consequently all of the artifacts delivered to MONAC were acquired by Dalby and Swanberg as agents for Sammons. It is a well-settled principle that in determining ownership of property, state law controls. United States v. Mitchell,403 U.S. 190, 197 (1971). More specifically, the rights and duties of a principal and agent toward each other are also determined by the law of the state which, with respect to the particular issue, has the most significant relationship to the parties and the transaction. See William B. Tanner Co., Inc. v. WIOO, Inc.,528 F.2d 262 (3d Cir. 1975); P.S. & E., Inc. v. Selastomer Detroit, Inc.,470 F.2d 125 (7th Cir. 1972). *312 Since all of the significant acts with respect to the relationship transpired in Montana, except the actual delivery of the artifacts to the Indian center, [6] we turn to Montana law in order to determine the scope of the agency in this case. Under Montana law, "[a]n agency may be created and an authority may be conferred upon a precedent authorization or subsequent ratification." Montana Code annotated section 28-10-201 (1985). Montana law further provides that "[a]n agent has such authority as his principal actually or ostensibly confers upon him," including doing "everything necessary and proper and usual, in the ordinary course of business, for effecting the purpose of his agency." Montana Code Annotated section 28-10-401, 405 (1985). The Supreme Court of Montana has consistently followed the rule of law that an agency "may be implied from conduct and from all the facts and circumstances in the case, and may be shown by circumstantial evidence. * * * Also, ratification may be implied from the acts and conduct of the alleged principal." Butler Manufacturing Co. v. J & L Implement Co.,167 Mont. 519, 540 P.2d 962, 965 (1975). *313 Our findings conclusively demonstrate that Dalby and Swanberg consented toa act on behalf of Sammons, that Sammons through Wright and Dobbins agreed to the arrangement, and that Sammons conferred upon Dalby and Swanberg as agents the authority to acquire and deliver to Schoenberg artifacts which Schoenberg's appraisers would appraise at $500,000. Therefore, the acquisition by Dalby and Swanberg of the Stuart Collection, the Flathead Collection and all of the other artifacts which eventually became known as the Myron G. Sammons Collection was "necessary and proper and usual to effect the purpose of the agency." As a result, Sammons had acquired title to all of the artifacts by March 30, 1977, the date by which all of the artifacts were delivered to MONAC. Respondent next contends that since Federal law prohibits the purchase or sale by an individual of certain bird feathers and appendages (including those of eagles and hawks), petitioner could not take title to 35 of the Indian artifacts (including the thunder pipe). Consequently, according to respondent the transfers of these items to petitioners and from petitioners to the Indian Center are void. See 16 U.S.C. Sections 668-668(d) *314 (Bald Eagle Protection Act); 16 U.S.C. Sections 703-711 (Migratory Bird Treaty Act); and 16 U.S.C. Section 1531 (Endangered Species Act). Petitioners counter that even if the transfer of these items is a violation of Federal law, the violation does not void the transfer of title to petitioners nor from petitioner to the Indian Center. We agree with petitioners because the statute relied upon by respondent merely provides that items transferred in violation of the statute are only subject to forfeiture. [7] *315 16 U.S.C. sections 668, 668b, 707 and 1540(a)(e). We also disagree with respondent's assertion that Sammons failed to make a valid gift of the artifcats to the Indian Center in 1977. We have found that on December 6, 1977 Sammons told Schoenberg by telephone that he and his wife wished to donate the artifacts to the Indian Center effective as of the end of December 1977. Since the Center had possession of the items at that time and formally accepted them as of December 30, 1977, we are satisfied that petitioners completed the contributions in 1977. See Ariz. Rev. Stat. Ann. section 33-601 (1974) [8] which provides: "[a] gift of any goods or chattels is not valid unless the gift is in writing, duly acknowledged and recorded, or by will, duly proved and recorded, or unless actual possession of the gift is passed to and remains with the donee or someone claiming under him." If the donor manifests an intent to give the property to the party claiming to be the donee and the latter is given full possession and control of the property prior to the donor's death, then there exists a valid *316 inter vivos gift. Elkins v. Vana,25 Ariz. App. 122, 541 P.2d 585 (1975). Finally, respondent contends that petitioners failed to establish the value of their contribution to the Indian Center. Where as here, a contribution is made in property other than money, the amount of the contribution is the fair market value of the property as of the date contributed, reduced when necessary as provided in section 170(e)(1). [9]The generally accepted definition of fair market value is set forth in respondent's regulations as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." Section 1.170A-1(c)(2), Income Tax Regs. Fair market value as of any given date is a question of fact to be resolved by considering all relevant evidence in the record.[10] *318 Kaplan v. Commissioner,43 T.C. 663, 665 (1965). *317 Here again, petitioners have the burden of proof. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). As set forth in our findings Schoenberg had the entire Sammons Collection inventoried, photographed, and appraised in June, July and August of 1977. The appraisals were made by Walter Crawford, Patsy Converse Bates, and Stu Barrett. Normally, such appraisals would be entitled to considerable weight since they were made shortly after the collection *319 was assembled, near the time the collection was given to the Center, and while the collection was still completely intact. However, neither Bates nor Barrett testified at the trial. Consequently, we are unable to attribute any weight to their conclusions. Walter Crawford did testify at the trial, but for the reasons hereinafter set out we are unable to accept his appraisal at face value because we have serious reservations about his independence. Mr. Crawford has been a collector, dealer, and trader in Indian artifacts and other materials since 1923. During his career he has made between 2,000 and 3,000 appraisals of Indian objects. He is particularly experienced with respect to the artifacts of the Southwest tribes, but he has made about 100 appraisals all for MONAC of artifacts from the Plains and Plateau Indians. However, at the time Mr. Crawford made the appraisal in this case he was MONAC's vice president and its appraisal representative in the Phoenix area. Furthermore, he had known Schoenberg for many years and had made numerous appraisals for him and the Indian Center, either at no cost or in exchange for a gift of museum items or the opportunity to purchase such items *320 at a discount. Also at or about the time of his appraisal of the Sammons Collection at least 70 other collections were being assembled by or for Schoenberg under circumstances which would lead to questionable donations to the Indian Center. The existence of these circumstances raises serious reservations about Mr. Crawford's independence and, as previously stated, we are unable to accept his appraisal at face value. In support of their evaluation of the Sammons Collection, petitioners also called as expert witnesses Dr. Frederick J. Dockstader and Mr. Alton R. Packard who submitted a joint appraisal report in which they assigned a fair market value as of December 1977 of $422,410 to the collection. Dr. Dockstader spent a great deal of his childhood on the Navajo and Hopi Indian reservations in Arizona. He later earned both a bachelor's degree and a master's degree from Arizona State University. He also has a Ph.D in American Studies from Western Reserve University in Cleveland, Ohio. Since finishing school he has served in a number of positions with various museums, organizations, and universities. He is a prolific writer and is the author of a number of books and articles on *321 the American Indian and Indian art. At the time of the trial of this matter Dr. Dockstader was serving as an adjunct professor of art history at Arizona State University and as a consultant to various museums and collections in the United States and Canada. On the other hand, Mr. Packard's expertise has been obtained from his experience as a merchant and dealer since 1955 in Indian artifacts in Santa Fe, New Mexico. He graduated from the University of New Mexico with a major in geology and a minor in anthropology and has served as a judge at numerous Indian art competitions. He was also commissioned to install an Indian artifacts exhibition at the Smithsonian Institution in Washington. At the time of the trial of this matter Mr. Packard was a member of the International Society of Appraisers and had appraised more than 2,500 Indian art collections. From the foregoing, it is apparent that Dr. Dockstader and Mr. Packard are also qualified to appraise a collection of Indian art and artifacts. They readily admit, however, that in making their appraisal in this case they were seriously handicapped by the fact that they were unable to inspect 427 of the articles in the Sammons Collection. *322 Instead, with respect to these articles they had to rely upon the photographs made under Schoenberg's supervision in 1977. However, they both testified that an appraisal made solely from photographs has serious limitations. For instance, according to their testimony, from photographs only it is difficult, if not impossible, to determine the condition, authenticity, or the age of artifacts. Therefore, since they were forced to work for the most part from photographs, they qualified their joint appraisal by stating that it was based upon the assumption that the items in the collection were genuine and in average to good condition. With this assumption in their report we are unable to accept their appraisal at face value. Respondent called as an expert witness Laurence Tyler, a dealer in Plains and Plateau Indian artifacts since 1964. His education includes a bachelor of art's degree and two years of graduate study in anthropology at the University of Washington. In making his appraisal Mr. Tyler personally examined several pieces of the Sammons Collection at MONAC in January of 1983. He also personally viewed an additional piece in April of 1983. In October of 1983 and in January *323 of 1984 he observed all of the photographs made in 1977 of the entire Sammons Collection. Questioning the authenticity and condition of most of the items in the collection and citing a number of comparable sales, Mr. Tyler testified that in his opinion the 1977 fair market value of the Sammons Collection was between $66,000 and $100,000. He also testified that an appraisal based uoin photographs has limitations because of the inability to determine the age and condition of the artifacts. Since 80 percent of his appraisal is based upon photographs, we are again unable to accept the evaluation at face value. For the reasons set forth hereinbefore we are unable to adopt the appraisal made by any one of the experts. However, from the record as a whole we are satisfied that in 1977 the collection had a fair market value in excess of that found by Mr. Tyler, respondent's expert, but considerably less than the values found by Dr. Dockstader, Mr. Parker, and Mr. Crawford, petitioners' experts. In fact, a careful review of the entire record fails to disclose any competent and fully reliable evidence as to the fair market value of the collection in 1977 other than the amount paid for the *324 collection by Dalby and Swanberg on the one hand and by Sammons on the other. According to the uncontradicted testimony of Dalby the total amount paid by Dalby and Swanberg was almost, but not more than, $140,000. The amount paid by Sammons was exactly $140,000. We conclude, therefore, that the total value of the Collection on the date in March of 1977 when the last delivery was made to the Indian Center was $140,000. We also conclude the total value of the collection did not change prior to its donation by petitioners to the Center in December of 1977. In arriving at the above conclusions, we have considered petitioners' arguments to the effect that the value of the Collection increased between its delivery and its donation because of appreciation or because all of the various items were brought together into a collection. We find these arguments unpersuasive, however, primarily because petitioners own experts testified to the contrary. Addition to Tax Under Section 6653(a)
Finally, we must determine whether any part of the deficiencies due from petitioners is attributable to their negligence or intentional disregard for rules and reguations within the meaning of section 6653(a). *325 Under this section "[n]egligence is lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances." Neely v. Commissioner,85 T.C. 934, 947 (1985); Marcello v. Commissioner,380 F.2d 499, 506 (5th Cir. 1967). Respondent contends that petitioners are liable for the addition to tax provided by section 6653(a) because their reliance upon the appraisals furnished by Schoenberg constituted negligence. Petitioners contend that throughout the entire transaction they relied upon the advice of their lawyer and accountant and as a result they were not negligent and did not intentionally disregard any rules and regulations.
It is true that under certain circumstances a good faith reliance on the advice of a tax advisor may constitute a defense to the addition to tax provided by section 6653(a). See Conlorez Corp. v. Commissioner,51 T.C. 467, 475 (1968). Generally speaking, however, a taxpayer cannot avoid the responsibility of filing accurate income tax returns by relying upon an agent. Bailey v. Commissioner,21 T.C. 678 (1954). We have found that Mr. Sammons successfully operated a truck business for several years, that he sold the business *326 at a substantial profit in 1976, and that he quickly and prudently eliminated with he considered was an unreasonable profit by Dalby and Swanberg on the acquisition of the Stuart Collection. Furthermore, from his demeanor at trial we are convinced that he is a reasonably intelligent individual. Consequently, we are compelled to conclude that Mr. Sammons, as an intelligent, prudent, and successful businessman knew or reasonably should have known that the appraisals obtained by Schoenberg were considerably greater than the fair market value of the collection. He, however, chose to accept as true the appraisals of over $500,000 for a collection of objects which he had just purchased for $140,000. Under the circumstances, we believe that such action by him is not the act of a reasonable and ordinarily prudent person. Neely v. Commissioner,supra.The assertion of the addition to tax under section 6653(a) is sustained. [11] *327 Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, unless otherwise indicated.All rule references are to the Tax Court Rules of Practice and Procedure unless otherwise provided.↩
2. At certain points in the record Joan Berry is also referred to as Joan Kelly.↩
3. The record contains no evidence that the collection was ever insured at any specific figure by the museum. Apparently Schoenberg was referring to coverage by some type of blanket policy owned by the museum. ↩
4. Contrary to this statement, at trial Schoenberg testified that upon receipt of the Stuart Collection he immediately protested that it was not sufficient to warrant an appraisal of $500,000.↩
5. Deaccessioning is the process by which artifacts or similar items owned by a museum are disposed of either through sale or exchange.↩
6. Even the delivery was pursuant to an agreement reached in Montana.↩
7. It is hornbook contract law that "[w]here a performance has been entered under an illegal bargain, the general rule is that the Court will leave the parties to the illegal bargain where it finds them." Calamari & Perillo, Contracts, p. 567. Williston states: "It is doubtless possible for the law to make even an attempted executed sale with transfer of possession so absolutely void that no title passes to the buyer; but the mere fact that a sale is against public policy or in violation of a statute does not have this effect." 15 Williston on Contracts, section 1787 (3d ed. 1972). This rule seems to have been incorporated by the Federal statutes in issue as the items themselves are only "subject to forfeitures." 16 U.S.C. sections 668, 668b, 707 and 1540(a)(e) (1982)↩. (Emphasis added.)
8. The artifacts, though located in the State of Washington from March 30, 1977 to December 30, 1977, are deemed to have been located in Arizona during this period because the situs of personal property is the domicile of the owner. In re Estate of Grady,79 Wash. 2d 41, 483 P.2d 114↩ (1971).
9. Section 170(e)(1) provides in pertinent part that: (1) General Rule. -- The amount of any charitable contribution of property otherwise taken into account under this section shall be reduced by the sum of -- (a) the amount of gain which would not have been long-term capital gain if the property contributed had been sold by the taxpayer at its fair market value (determined at the time of such contribution), * * *. In 1977, section 1222 provided that gain from the sale or exchange of a capital asset held for more than nine months was to be treated as long term capital gain. Although we have found that petitioners owned all of the artifacts for at least nine months, the application of section 170(e)(1)↩ is of no consequence due to our holding on this issue. 10. The fair market value of art can be the subject of considerable disagreement among appraisers. See Neely v. Commissioner,85 T.C. 934 (1985); Anselmo v. Commissioner,80 T.C. 872 (1983), affd. 757 F.2d 1208 (11th Cir. 1985). The Tax Reform Act of 1984 amended section 6659 so as to provide increased additions to tax for valuation overstatements, reporting requirements for charitable donees which receive property and dispose of it within two years and detailed appraisal requirements. When applicable, the statute requires the donor to obtain a "qualified appraisal" which, pursuant to the Temporary Regulations, means the appraisal must have been conducted by a qualified appraiser not earlier than 60 days prior to the contribution. Section 6659(f); section 1.170A-13T(c)(3)(i)(A), Temporary Income Tax Regs., 48 Fed. Reg. 50659 (Dec. 31, 1984). A qualified appraiser is an appraiser who was not a party to the transaction in which the donor obtained the property nor related to any person whose relationship to the donor would cause a reasonable person to question their independence. See section 1.170A-13T(c)(5), Temporary Income Tax Regs., 49 Fed. Reg. 50659↩ (Dec. 31, 1984).
11. For the years under consideration here, about 70 to 80 donations made to MONAC were questioned by respondent. See Johnson v. Commissioner,85 T.C. 469 (1985), involving donations to MONAC and where we asserted, sua sponte, an addition to interest under section 6621(d).