T.C. Memo. 2001-258


UNITED STATES TAX COURT


ESTATE OF JOHN L. BAIRD, DECEASED, ELLEN B. KIRKLAND AND J.
SAMUEL BAIRD, CO-EXECUTORS, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

ESTATE OF SARAH W. BAIRD, DECEASED, ELLEN B. KIRKLAND AND J.
SAMUEL BAIRD, CO-EXECUTORS, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 8656-99, 8657-99.     Filed September 28, 2001.


William T.F. Dykes, for petitioners.

Wanda M. Cohen, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

GERBER, Judge:  Separate notices of deficiency, containing
determinations of estate tax deficiencies, were issued to the

above-captioned estates.[1]  For the Estate of John L. Baird,
respondent determined an estate tax deficiency of $104,765.  For
the Estate of Sarah W. Baird, respondent determined an estate tax
deficiency of $240,282.  The sole remaining controversy concerns
the value, at their respective dates of death, of each decedent's
fractional interest in a family trust holding timberland.[2]

### FINDINGS OF FACT

John L. Baird and Sarah W. Baird were married at all
pertinent times.  John died on December 18, 1994.  Sarah died
less than 1 year later, on November 2, 1995.  At all pertinent
times the coexecutors and decedents resided in Louisiana.  At
their respective times of death, John held a 14/65 interest and
Sarah a 17/65 interest in a trust owning 16 noncontiguous tracts
of timberland, comprising 2,957 acres in Sabine Parish,
Louisiana.  As of December 18, 1994, the undivided fee interest
in the 16 parcels of timberland had a fair market value of
$4,685,333.  As of November 2, 1995, the undivided fee interest

---

[1] These cases were consolidated for purposes of trial,
briefing, and opinion.

[2] In addition to the valuation issues for each estate, the
parties must also reach agreement on the computation of the
allowable amount of administration expenses and the amount of the
credit, if any, allowable to the Estate of Sarah W. Baird.  The
parties have settled several other matters concerning increases
and/or reductions to the gross estate of the Estate of John L.
Baird, and all these matters will be left for the Rule 155 phase
of this case.  All Rule references are to the Tax Court Rules of
Practice and Procedure.

in the 16 parcels of timberland had a fair market value of $5,091,285.

On August 1, 1977, John, Sarah, and three of Sarah's relatives, as settlors, established an inter vivos trust pursuant to the laws of Louisiana.  Before the 1977 creation of the family trust, Sarah, O.E. Williams, and two of their other siblings coowned several thousand acres of timberland.  With the consent of his siblings, O.E. Williams initiated a voluntary partition.  The partition was a difficult experience for family members.  The relatives contributed their respective holdings, resulting in a 14/65 (21.54 percent) and a 17/65 (26.15 percent) undivided interest in the family trust being held by John and Sarah, respectively.  The remainder of the trust interests were contributed by Sarah's relatives, including 31/65 (47.69 percent) by her brother, O.E. Williams, and 1.5/65 (2.31 percent) each by Sarah's nephew and niece.  The trust was intended to keep the 16 parcels held by family members in undivided ownership.  The family trust provided for the sale of an interest, but only with the written consent of all of the beneficiaries.  The 16 parcels ranged in size from 32 to 320 acres, and most of it was best suited to use as timberland.  Approximately 140 of the 2,957 acres had some potential for residential development.  Less than one-half of an acre had residential development as its highest and best use.

O.E. Williams has continually managed the trust properties since the 1970s, and it was expected that he would continue to do so. O.E. Williams generally did not consult with his cotrustees and/or family members in the management of the trust timberland. His independent management was not necessarily in accord with the best management practices.

Reported in John's estate was his undivided one-half community property interest in the 14/65 interest in the trust at a value of $707,972, after applying a 25-percent fractionalization discount. In an amended return for John's estate, a refund was claimed on the basis of an increased fractionalization discount of 50 percent. Ultimately, a 60-percent discount was claimed by John's estate. The 14/65 interest after applying a 50-percent discount was returned at $550,378. After applying a 60-percent discount the reported amount would have been reduced to $504,610.37.

Sarah's 17/65 interest was reported in her estate's tax return at a value of $665,686, after applying a 50-percent fractionalization discount. In an amended return for Sarah's estate, a refund was claimed on the basis of a 60-percent increased fractionalization discount, which resulted in a reported value of $449,456.27.

Respondent determined that John's 14/65 interest had a date of death fair market value of $975,091. Respondent determined

that Sarah's 17/65 interest had a date of death fair market value of $1,290,211.

## OPINION

We consider here circumstances where a married couple die within 1 year of each other. Each decedent, at the time of his or her death, held a partial interest in a family trust. The trust, in turn, held 16 parcels of timberland. The parties agree on the fair market value of the 16 parcels of timberland on the date of each decedent's death. The controversy centers on the amount of discount applied where each decedent held a fractional interest through the family trust.

Generally, the estates have approached valuation by means of what they consider to be comparable sales of fractional interests. On the basis of the relatively limited universe of the sales of partial interests in timberland, the estates' experts have opined that discounts should range from 55 percent to as much as 90 percent. Respondent agrees that some discount is appropriate, but he contends that the size of the discounts proposed by the estates is excessive and that the estates' experts are merely advocates for petitioners' position.

Valuation of a property interest for Federal estate tax purposes is a factual question. See Estate of Bonner v. United States, 84 F.3d 196, 197 (5th Cir. 1996); Sammons v. Commissioner, 838 F.2d 330, 333 (9th Cir. 1988), affg. on this

point and revg. in part on another ground T.C. Memo. 1986-318.
The fair market value of a property interest is determined under
the "willing buyer-willing seller standard" set forth in section
20.2031-1(b), Estate Tax Regs., as follows:

> The fair market value is the price at which the
> property would change hands between a willing buyer and
> a willing seller, neither being under any compulsion to
> buy or sell and both having reasonable knowledge of
> relevant facts.  The fair market value of a particular
> item of property includible in the decedent's gross
> estate is not to be determined by a forced sale price.
> Nor is the fair market value of an item of property to
> be determined by the sale price of the item in a market
> other than that in which such item is most commonly
> sold to the public, taking into account the location of
> the item wherever appropriate * * *.

It is implicit that the buyer and seller have knowledge of
all the relevant facts concerning the valuation property.  United
States v. Cartwright, 411 U.S. 546, 551 (1973).  It is also
implicit that the buyer and seller would aim to maximize profit
and/or minimize cost in the setting of a hypothetical sale.  See
Estate of Watts v. Commissioner, 823 F.2d 483, 486 (11th Cir.
1987), affg. T.C. Memo. 1985-595; Estate of Newhouse v.
Commissioner, 94 T.C. 193, 218 (1990).  Therefore, we consider
the view of both the hypothetical buyer and seller.  Kolom v.
Commissioner, 644 F.2d 1282, 1288 (9th Cir. 1981), affg. 71 T.C.
235 (1978).

The estates offered three expert witnesses, and respondent
offered one.  The estates' experts were found to be qualified,
and their reports were received as their direct testimony in

accord with this Court's Rules of Practice and Procedure. Respondent's expert, however, was found not to be specifically qualified to assist the trier of fact (Court) on the question of the discount to be applied, if any, to a fractional interest in timberland.

It is noted that the parties stipulated the fair market value of the undivided fee interest. Further, the parties agree that there should be some discount because of the nature of the decedents' ownership. The only question we consider is the amount of the discount applicable to the fractional interests held by the decedents at their dates of death.

Valuation of an interest in property is a highly factual pursuit, and it is within the Court's discretion to evaluate the cogency of the expert witnesses' conclusions or opinions. Sammons v. Commissioner, supra. Opinions of experts are evaluated in light of each expert's demonstrated qualifications and the evidence in the record. Estate of Davis v. Commissioner, 110 T.C. 530, 538 (1998) (and cases cited therein). We may accept or reject all or part of an expert's opinion. Id.

The Estates' Expert Witnesses

The estates rely on three expert witnesses to support their proposed discounts for the partial interests under consideration. Respondent attempted to expose the weaknesses of the estates' experts in order to show that estates' proposed discounts are excessive.

A.  <u>John A. Young</u>

John A. Young, a real estate appraiser offered by petitioners, prepared a fractionalization discount study in which he concluded that fractionalized interest discounts should be at least 50 percent of the proportionate fee value.  Mr. Young's conclusion was based on his analysis of what he considered to be six comparable sales of fractional interests in timberland in northwest Louisiana.  Generally, Mr. Young was able to find hard evidence of the sale price for a fractional interest.

In order to determine the fair market value of a full fee interest Mr. Young resorted to secondary information and opinion. Through conversations with parties to the transactions and other related information, he predicated a fee fair market value for each property.  In some instances, the fee values were a matter of conjecture and were not based on actual or comparable sales. However, using the full fee value as a base, Mr. Young calculated the percentage discount of known partial sales.

The first property regarded as comparable by Mr. Young was a 160-acre tract of timberland that was owned by Pennzoil Exploration and several other owners.  The buyer was interested in harvesting the timber and wanted to acquire the 160-acre tract.  Seven different partial interests were purchased during the period May 1995 through February 1996.  These purchases gave the buyer a cumulative interest of almost 32 percent of the

undivided 160 acres.  These partial interests were acquired for amounts that were approximately 58 percent to 62 percent less than their proportionate shares of the fair market value of the full fee as estimated by Mr. Young.  During October 1996 the buyer acquired the remaining two-thirds of the property from three sellers for approximately 14 percent less than a proportionate share (i.e., two-thirds) of Mr. Young's estimated fair market value of the full fee.

The second series of partial acquisitions considered by Mr. Young occurred during September 1994.  It involved 37 different tracts totaling almost 830 acres which were owned by three different groups of individuals.  The purchaser acquired three approximately equal interests for equal purchase prices.  On the basis of Mr. Young's estimated fee fair market value, the fractional purchases were discounted approximately 41 percent.

In the third series of partial acquisitions during 1993, seven partial interests, collectively representing almost a 50-percent interest, were purchased from members of the same family for what appears to be the same price per acre.  The discounts from the estimated full-fee fair market value were all approximately 82 percent, using Mr. Young's fee value.

In the fourth series of partial acquisitions, interests in amounts approximating 35 percent and 7 percent were acquired in 1992, and the remaining 58 percent was acquired in 1995.  The

1992 acquisitions were discounted by approximately 59 percent and 65 percent, respectively, and the 1995 acquisition was discounted by approximately 36 percent. Again, Mr. Young's estimate of fee fair market value was used as the base.

The fifth and sixth series of partial acquisitions each involved the acquisition of two 50-percent interests. The fifth consisted of acquisitions in 1995 and 1997 with discounts of approximately 67 percent and 50 percent, respectively. The sixth partial acquisition involved two 1997 purchases with fractional interest discounts of approximately 38 percent and 44 percent, respectively.

Mr. Young did not conclude that a particular percentage would be appropriate for the partial interests that we consider in these cases. Instead, Mr. Young opined that on the basis of the above-described transactions, a discount of at least 50 percent was appropriate for valuing a partial undivided interest in Louisiana timberland.

Mr. Young did adjust for differences that might occur where fractional sales were actually acquisitions by a majority holder. He showed that substantially smaller fractional discounts occurred in transactions where the buyer had or achieved control. Conversely, the discounts were substantially larger where buyers were purchasing a partial interest and did not have control of the fee.

Mr. Young also discussed other factors that might affect the amount of the discount, such as tract size, lack of management control, the number of coowners, and the cost of acquiring a fee interest. He did not, however, provide any guidance as to how those factors should be taken into account in valuing the 16 parcels of timberland under consideration.

Although the six sales of timber properties cited by Mr. Young occurred in northwest Louisiana, respondent contends that there has been no correlation to the 16 parcels of timberland we consider in these cases. In addition, respondent points out that Mr. Young, in his discussion of the practicality of partition, assumed that the partition would result in 65 shares. That assumption tends to exaggerate the cost of partition.

With respect to Mr. Young's comparables, respondent provided some information about each reflecting that the fee value used by Mr. Young could be too high. Any reduction in the fee value used would accordingly and proportionately reduce the percentage discount that could be attributable to a fractional interest.[3]

---

[3] Mr. Young also provided a report in which he commented on various assumptions that had been provided by the estates' counsel. It was not evident how Mr. Young's comments were formulated and why he would be qualified to opine on certain of the assumptions. Accordingly, we do not rely on his commentary concerning the estates' assumptions.

B.  Lewis C. Peters

Lewis C. Peters, a forester/real estate appraiser, like Mr. Young, opined on the relationship of discounts to undivided fractional interests in timberland on behalf of petitioners.  He relied on transactions in fractional interests in timberland in Maine and in the East Texas/Louisiana area.  Mr. Peters has been developing information on the sales of fractional interests in timberland for a number of years, and he has found only two markets for such property--Maine and East Texas/Louisiana.  In that regard, Maine had a more active and better established market than the East Texas/Louisiana area.

Mr. Peter's estimated that the mean discount attributable to fractional interests in timberland is 55 percent.  He relied on 104 transactions that occurred from 1969 through 1997.  Unlike Mr. Young, Mr. Peters did not adjust for differences that may occur where fractional sales were actually acquisitions by a majority holder.  Instead, Mr. Peters simply used a statistical mean or average of the sales.  Like Mr. Young, Mr. Peters obtained the full-fee fair market value by talking with owners, collecting information about subsequent full-fee sales, and discussing this issue with people in the timberland market.

Respondent contends that Mr. Peters's conclusions are unreliable because many of the alleged comparables were too remote from the year in question.  Respondent also contends that

Mr. Peters's estimated fair market values were not from reliable or verifiable sources. Respondent also points out that Mr. Peters's study contained discounts for fractional interests that varied from 29 percent to 83 percent. To the extent that subsequent sales were used to determine the amount of discount, respondent indicates that neither Mr. Young nor Mr. Peters adjusted (reduced) the fair market value to reflect any intervening inflation.

Finally, respondent points out that Messrs. Young and Peters both used the Pennzoil sale as a comparable but used differing data and arrived at differing discounts. Mr. Peters arrived at an average 36-percent discount using a fair market value of almost $474,000, whereas Mr. Young had discounts ranging from 14.10 percent to 62.06 percent using a fair market value of $420,000. These discrepancies, respondent contends, reflect a lack of credibility in the experts' reports.

C. James Steele III

The estates' third expert has engaged for more than 20 years in the business of buying and selling rural Louisiana farm and timberland with concentration on undivided interests in relatively small (1,000 acres or less) parcels. Mr. Steele's entity was the purchaser in the Pennzoil transaction relied on by both Messrs. Young and Peters.

In the Pennzoil transaction, Mr. Steele's entity was attempting to purchase a controlling (at least 80 percent) or complete interest in the Pennzoil property. Purchases of Pennzoil fractional interests were initially subjected to discounts for the fractional interests in amounts generally around 60 percent. When the buyer had acquired sufficient partial interests to hold at least 80 percent, the discounts precipitously dropped to just over 14 percent.

This discount pattern confirms the estates' argument. Partial interests that do not constitute or result in a controlling interest are subject to substantially greater discounts than partial interests acquired by a controlling interest holder or which result in control of the fee.

In his report, Mr. Steele concluded that a discount of at least 55 percent would be appropriate for the purchase of partial interests in Louisiana timberland. During his trial testimony Mr. Steele opined that the value of the partial interests should be discounted 90 percent from the fair market value of the full fee interest.

The Court found Mr. Steele's testimony helpful and germane to the valuation of partial interests in Louisiana timberland. Although there are sales of fractional interests in timberland in Louisiana, such activity is relatively infrequent, and only limited information about such sales is available. Mr. Steele

was either aware of or involved in most of the known sales of fractional interests in Louisiana. He also makes his living from such sales and is well known to lawyers, courts, and others as a resource in situations where fractional interests and/or partition is involved.

Mr. Steele evaluates timber and mineral properties on the basis of the idiosyncracies of the ownership and related conditions. So, for example, he may seek out disgruntled family members who own a partial interest and are seeking to sell their interest. In such situations, Mr. Steele has studied the potential for and used partition as a means to make a profit from the partial interest. According to Mr. Steele, those situations require "staying power" because of the potential for resistance by the remaining family/coowners who may resist partition, either in kind or by licitation.[4] Mr. Steele had a personal experience where his acquired partial interest was tied up for as long as 21 years. In general, Mr. Steele's experience reflects that it is not unusual for partition to take as long as 5 years.

Mr. Steele's unique and extensive experience makes him particularly well qualified to address the amount of discount for a fractional interest in Louisiana timberland. Although Mr. Steele and petitioners' other experts opined, in general, that

---

[4] "Licitation" is a term used to describe the sale of partitioned realty and the division and distribution of the sale proceeds as opposed to partition in kind where the property is divided and distributed to the coowners.

fractional interests in Louisiana timberland should be discounted by 55 percent, those opinions were based on means or averages of the fractional sales information available.  We also note that the full fair market value of the properties used as comparables may have been questionable, so that the discounts could have been smaller or larger depending upon whether the actual fair market value was lower or higher.

Mr. Steele's personal experiences during more than 20 years of involvement with fractional interests in Louisiana, reflect the following.

(1) The fact that the market is severely limited drives prices down (increasing discounts).  Most buyers have no desire to expend the time and expense to acquire full ownership.  Generally, timber companies are not interested in purchasing fractional interests and lending institutions are not likely to lend money to holders of fractional interests.

(2) Problems arise concerning the management of undivided interest properties.  There is a tendency for persons who own partial interests in property to expend less time and money than they would have spent on solely owned property, resulting in some amount of mismanagement.

(3) Louisiana fractional interest holders with less than an 80-percent interest lack control over the use of the timber without consent of the other owners.

(4) The choices available to a Louisiana fractional interest holder with less than 80-percent ownership are to:

(a) Sell the fractional interest but incur the additional expense of advertising and/or locating a buyer;

(b) buy out the other interests.  This process can involve expenses and delays related to locating fractional interest holders, recording expenses, deed preparation, title opinions, and the possibility of perfecting title with respect to ancestral predecessors of current owners;

(c) attempt voluntary partition in kind, which is often "complex, rancorous, and protracted".  It has been Mr. Steele's experience that the problems encountered increase as the number of fractional owners increases.  In some instances it may reach a point where agreement becomes impossible;

(d) bring suit for partition in kind or by licitation.  This process will result in "significant legal expense" and delays.

(5) The delay associated with partition is at least 1 year, but it is more likely to take several years.  In the interim expenses are being incurred and the investment in the fractional interest is "frozen".

(6) It has been Mr. Steele's experience that unexpected expenses occur in connection with perfecting sole ownership or control.  It has been his experience that unanticipated legal problems may arise.

(7) The buyer of an undivided interest must have financial "staying power" and be able to buy the entire property at any partition sale because of the possibility of underbidding of amounts that would be proportionately less than the cost of the undivided interest.

Mr. Steele considers the following factors in determining the amount of discount that should be applied in the purchase of a fractional interest:  Fair market value of 100-percent ownership; percentage available for sale; total number of owners; "staying power" of existing owners; property location; number of tracts; number of acres; ability to influence property management by the buyer of a fractional interest; continuity of the tracts; access to the property(ies); topography (including wetland classifications); and mineral value, either in or out of production.

Using his knowledge and experience, he opined in his written report that the discount for the fractional interests under consideration should be at least 55 percent.  During his trial testimony, Mr. Steele concluded that he would discount the fractional interests in question by 90 percent on the basis of

the following:  (1) The fractional interests are held in a trust causing an inability to directly access any proceeds of partition; (2) the beneficial fractional interest holders were from the same family generally resulting in less agreement on a course of action;[5] (3) partition suits in Louisiana require that all mineral owners be made parties to the proceeding; (4) the costs of partition might be assessed against and borne by the instigating partial interest holder; and (5) a buyer of a 14/65 or 17/65 interest would have no control and the other interests could limit profitable use or sale of the property.  In this case, the property has been poorly managed by one of the beneficiaries/family members for years, and the only remedy would be to wait until other interest holders die or to attempt partition.

The reasons cited by Mr. Steele do not support his conclusion for a 90-percent discount.  Several of the reasons he cites were already considered in his written report to arrive at his "at least 55 percent" discount opinion.  We do agree, however, with his observation that this family has experienced prior disagreement, which precipitated the creation of the trust. In addition, one family member has been allowed to independently

---

[5] Because of Mr. Steele's reputation and willingness to be involved in partial interests, disgruntled family members seek him out to purchase their fractional interests.  In those experiences he has found that the likelihood of disagreement is greater among family members.

manage the 16 parcels, and it has been shown that his management was poor.  These are facts that were available to and would certainly influence a knowledgeable buyer and should be factored into the discount percentage.

The Possibility of Partition--Effect on Value

The estates argue that the use of partition, as a legal matter, is fraught with uncertainty.  Relying on their experts, petitioners contend that partition of the properties in question would be protracted, thus increasing the discount on the fractional interests in issue.  Respondent disagrees with petitioners and contends that the properties could be relatively easily partitioned in 3 or 4 months if partition were uncontested.

Generally, the "Potential costs and fees associated with partition or other legal controversies among owners, along with a limited market for fractional interests and lack of control, are all considerations rationally related to the value of an asset." Estate of Bonner v. United States, 84 F.3d 196, 197-198 (5th Cir. 1996).  Accordingly, the cost of partition does not set some absolute limit on the amount of discount.  Instead, it is a factor to be considered.

Each party has attempted to either maximize or minimize the effect that partition may have upon the discount attributable to a fractional interest in timberland.  There is no way to

accurately predict that partition will be necessary.  It is possible that the remaining family members may be open to dividing or managing the property in accord with a new owner's wishes.  Conversely, it is also possible that the remaining family members will be adverse to a new owner's wishes.

Here, the estates have shown that, under Louisiana law, there are uncertainties and disabilities associated with an undivided minority interest in property.  That is especially true here where the property is held in trust and where the family members have previously experienced difficulties and have allowed one family member to manage the properties without holding him to a high standard.  It has also been shown that the family members placed the property into trust in order to keep the property in their family.  The circumstances that would have been perceived by a willing buyer indicate that the remaining family members would be resistant to and make it difficult for an outside buyer. We reach this conclusion, in part, on the basis of the family's propensity to allow poor management of the timberland to their own financial detriment.  Accordingly, some additional discount is appropriate on the basis of the record in this case.

The evidence, experts' reports, and other testimony reflect that the market for partial interests was extremely limited.  One of petitioners' experts, Mr. Steele, was the buyer of many such properties.  His experiences reflected that partition under the

facts of these cases would have been difficult, protracted, and expensive.

The Variations Between the Estates' Reported Values and Those Maintained for Trial

Finally, we consider the escalation of the discounts claimed by the estates. John's estate initially reported a value for the fractional interest that was discounted by only 25 percent. By the time Sarah died, the value of her fractional interest was reported at a value that was discounted by 50 percent. At that point, John's estate amended its return and claimed a 50-percent discount. As these matters were further developed during the audit examination and controversy, information was discovered that caused the estates to further reduce the reported value of the fractional interests by claiming a 60-percent discount. Finally, the estates' litigating position, based on Mr. Steele's testimony, was that both fractional interests should be discounted by 90 percent.

Respondent points to the escalation of the discounts and contends that it merely reflects the estates' propensity to take aggressive and excessive positions. Respondent contends that the discount initially claimed by John's estate was closer to the correct amount and should represent the maximum amount to which either estate should be entitled. The estates have shown, however, that the discounts initially claimed did not take into

account the true marketplace and the price that would be paid by a willing buyer.

The 25-percent discount used by John's estate was based on the return preparers' analysis of a court opinion in which a discount for a fractional interest was found.[6] When the return preparer increased the amount to 50 percent, he relied on a series of court opinions in which discounts for fractional interests were allowed.[7] Although it may be appropriate to consider the amounts of discounts decided by courts in prior cases, those discounts are not intended as minimum or maximum limits for certain types of discounts.[8] The amount of discount

---

[6] John's estate's tax return preparer relied on Estate of Bright v. United States, 658 F.2d 999 (5th Cir. 1981).

[7] The preparer, in support of a 50-percent discount in the amended return, relied on a series of cases of which the following are representative: Propstra v. United States, 680 F.2d 1248 (9th Cir. 1982); Estate of Campanari v. Commissioner, 5 T.C. 488 (1945); Estate of Cervin v. Commissioner, T.C. Memo. 1994-550; LeFrak v. Commissioner, T.C. Memo. 1993-526; and Estate of Youle v. Commissioner, T.C. Memo. 1989-138. We note that the cited opinions appear to be relied upon for their general rationale and not because 50-percent discounts were allowed.

[8] The parties in estate tax cases often play a "valuation game" and advocate high and low values to provide the finder of facts with limits within which the parties may be satisfied with the final decision. Because of that phenomenon, we may expect that estates will report the lowest possible value, and that the Commissioner will determine the highest possible value. Those very dynamics may raise suspicion about the parties' positions on estate tax valuation issues. In this case, however, the facts reflect that, initially, John's estate was not playing the "game". Even after the "game" began, both John's and Sarah's estates did not get up to speed until the trial had commenced.

in each case must be determined ad hoc, and the facts in each case must provide the basis for the proper amount of discount. The facts in this case, along with our understanding of the actual marketplace, reflect that fractional interests in rural Louisiana timberland sell at substantial discounts and, hence, the estate's reporting positions were conservative in their approach to discounting.

Conclusion

After considering the record and the experts' reports and testimony, we hold that the estates have established 55 percent as a mean and/or average amount by which fractional interests in Louisiana timberland which do not result in control are discounted.  We are also convinced that the peculiar circumstances shown to exist with respect to the decedents' remaining family members support an increased discount.

We have placed reliance in Mr. Steele's expertise and actual practical experience.  His report and testimony were based on his personal knowledge and experience in the very marketplace under consideration.  Mr. Steele's "at least 55-percent discount" in his written report comported with the other experts' findings and conclusions.  Mr. Steele's trial testimony suggesting a 90-percent discount, however, was unfounded and without support in the record.  We find it hard to accept that a willing seller would accept 10 cents on the dollar for a partial interest in

timberland, and no such comparables were shown to exist.[9]

Although there are no truly comparable sales in this record, the detail available on the Pennzoil transaction does provide some measure of a contemporaneous arm's-length transaction.  In the series of Pennzoil transactions the discounts before acquisition of a controlling interest hovered around 60 percent. On the basis of that example and the other factors discussed above, we hold that John's and Sarah's fractional interests should be discounted 60 percent, as claimed by the estates, from the fair market values agreed to by the parties.

To reflect the foregoing and considering the parties' agreements,

<u>Decisions will be entered</u>

<u>under Rule 155.</u>

---

[9] It appears that Mr. Steele's suggested 90-percent discount may represent only a buyer's point of view.  Perhaps it would serve as a low bid to initiate negotiations.