T.C. Memo. 2010-103

UNITED STATES TAX COURT

THE RINGGOLD TELEPHONE COMPANY, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 22783-07.                    Filed May 10, 2010.

<u>Timothy J. Peaden</u> and <u>Timothy L. Fallaw II</u>, for petitioner.

<u>Eric B. Jorgensen</u> and <u>James C. Lanning, Jr.</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

WELLS, <u>Judge</u>:  Respondent determined a deficiency of
$925,260 in petitioner's Federal income tax for tax year 2000 and
a penalty under section 6662(a)[1] of $185,052.  The issues to be

_____

[1]Unless otherwise indicated, all section references are to
the Internal Revenue Code in effect for the year in issue, and
all subchapter references are to ch. 1 of that Code.  All Rule
(continued...)

decided are: (1) For purposes of determining built-in gain under section 1374, whether the fair market value of a partnership interest petitioner owned as of January 1, 2000, was $2,980,000, as petitioner contends, or $5,220,423, as respondent contends, and (2) whether petitioner is liable for the accuracy-related penalty respondent determined pursuant to section 6662.

FINDINGS OF FACT

Some of the facts and certain exhibits have been stipulated. The stipulations of fact are incorporated in this opinion by reference and are found as facts. Petitioner was a Georgia corporation at the time the petition was filed.

Petitioner provides telecommunications services to customers in Georgia and Tennessee.

Before tax year 2000, petitioner was taxed as a C corporation for Federal income tax purposes. Petitioner made a valid election to be classified as an S corporation for Federal income tax purposes effective January 1, 2000.

Petitioner's Interest in CRC and CHAT

On January 1, 2000, petitioner owned a 25-percent partnership interest in Cellular Radio of Chattanooga (CRC) (hereinafter we will refer to petitioner's partnership interest in CRC as the CRC interest). As of January 1, 2000, the other

---

[1](...continued)
references are to the Tax Court Rules of Practice and Procedure.

partners in CRC, each with a 25-percent interest, were BellSouth Mobility, Inc. (BellSouth), Trenton Telephone Co., and Bledsoe Telephone Co.

As of January 1, 2000, CRC's primary asset was a 29.54-percent limited partnership interest in the Chattanooga MSA Limited Partnership (CHAT), which provided wireless telecommunications service in Chattanooga, Tennessee.

Before September 30, 2000, CHAT's general partner was Chattanooga CGSA, Inc.  Effective October 1, 2000, CHAT's general partner was Chattanooga CGSA, L.L.C.  Both of the successive general partners were, at all times relevant to this proceeding, wholly owned by BellSouth, and hereinafter they collectively are referred to as Chattanooga CGSA.  As the only general partner of CHAT, Chattanooga CGSA was the only partner with the authority to request additional capital contributions and make distributions of partnership profits.

From January 1 through November 27, 2000, CHAT was owned as follows:

| Partnership | Ownership Interest (percentage) | | |
| | General partnership | Limited partnership | Total |
| --- | --- | --- | --- |
| Chattanooga CGSA | 40 | 15.31 | 55.31 |
| Alltel Cellular Associates of South Carolina Limited Partnership | | 15.15 | 15.15 |
| CRC | | 29.54 | 29.54 |

At all times between January 1 and November 27, 2000, petitioner indirectly owned a 7.385-percent interest in CHAT as a result of petitioner's 25-percent partnership interest in CRC and CRC's 29.54-percent limited partnership interest in CHAT.

BellSouth acquired petitioner's 25-percent interest in CRC on November 27, 2000. Before that date, BellSouth owned 62.7 percent of CHAT--7.385 percent through its interest in CRC and 55.31 percent through its ownership of Chattanooga CGSA. Through its ownership of Chattanooga CGSA, BellSouth controlled CHAT.

The interests of petitioner and BellSouth in CHAT by virtue of their ownership of interests in CRC and Chattanooga CGSA before November 27, 2000, were are as follows:

| | Ownership interest (percentage) | | |
| | CHAT via Chattanooga CGSA | CHAT via CRC | CHAT total |
| --- | --- | --- | --- |
| BellSouth | 55.31 | 7.385 | 62.695 |
| Petitioner | -- | 7.385 | 7.385 |

On January 1, 2000, CRC interests were not publicly traded, and petitioner's right to sell its 25-percent interest in CRC was subject to a right of first refusal in favor of the other CRC partners.

On January 1, 2000, partnership interests in CHAT were not publicly traded.

Reporting of Built-In Gain on the Sale of the CRC Interest

On September 30, 1999, at petitioner's request, the certified public accounting firm Warinner, Gesinger & Associates, L.L.C. (Warinner), issued a report using 1998 financial data that valued the CRC interest of petitioner at approximately $4,600,000 (September 1999 report).

In early 2000, Phil Erli (Mr. Erli), then the general manager of petitioner, requested that Warinner prepare a revised valuation report to correct arithmetical errors in the September 1999 report and to include more recent data in the valuation analysis. On February 15, 2000, Warinner issued a revised report on the basis of financial data through September 30, 1999, which estimated the value of the CRC interest to be approximately $2,600,000 (February 2000 report).

At the time that Mr. Erli requested the February 2000 report, he was not aware of the existence of the built-in gains tax and the impact that the determination of fair market value would have on that tax.

Petitioner's management did not become aware of the built-in gains tax until sometime in late 2000 or early 2001.

In March of 2000, petitioner engaged the investment banking firm Robinson-Humphrey Co., L.L.C. (Robinson-Humphrey), to identify potential buyers and to market the CRC interest. Robinson-Humphrey prepared an offering memorandum, which was

provided to prospective purchasers and listed the value of the CRC interest as approximately $7 million.  Robinson-Humphrey's compensation was contingent on the sale price of the CRC interest; accordingly, it had an incentive to try to generate a high sale price.  The Robinson-Humphrey memorandum was prepared for marketing purposes rather than as an objective assessment of value.

Petitioner did not expect to get an offer of $7 million for its interest.  Indeed, petitioner's management had decided that it would accept as little as $2 million for the CRC interest.

On July 6, 2000, BellSouth offered to purchase the CRC interest for $5,022,929, subject to working capital adjustments as of the date of closing.

Petitioner received no other offers to purchase the CRC interest.  The other partners in CRC did not exercise their rights of first refusal with respect to the offer made by BellSouth.

Petitioner accepted BellSouth's offer on July 11, 2000, and the sale of the CRC interest to BellSouth was completed on November 27, 2000, for $5,220,043.

Petitioner timely filed a Federal income tax return on Form 1120S, U.S. Income Tax Return for an S Corporation, for the 2000 tax year.

On its 2000 Form 1120S, petitioner reported the amount of recognized built-in gain attributable to the CRC interest using a fair market value as of January 1, 2000 (the valuation date), of $2,600,000, the amount determined by the February 2000 report. Petitioner used the valuation of the CRC interest contained in the February 2000 report on the advice of Stephen Henley, a certified public accountant petitioner consulted to review its 2000 Federal income tax return.

Respondent sent petitioner a notice of deficiency dated August 3, 2007, that determined a deficiency of $925,260 and a penalty pursuant to section 6662(a) of $185,052.  The deficiency resulted from respondent's determination that the fair market value of the CRC interest was $5,243,602[2] rather than the $2,600,000 shown on petitioner's 2000 Federal income tax return.

OPINION

## I.   Valuation of the CRC Interest

The issue we must decide is the fair market value of the CRC interest on the valuation date; i.e. on January 1, 2000, the effective date of petitioner's subchapter S election.

---

[2]We note that Schedule 2 to the notice of deficiency, Explanation of Adjustments, states that the value of the CRC interest is determined to be $5,220,423.  However, Schedule 3 to the notice of deficiency uses the value of $5,243,602 in calculating the built-in gains tax.

A. <u>Built-In Gains Tax</u>

Section 1374 imposes a tax on built-in gains--gains accrued while an asset is held by a C corporation which later makes a subchapter S election. An S corporation's gain upon disposition of an asset generally is treated as built-in gain to the extent that the fair market value of that asset on the first day of the first taxable year for which the corporation's subchapter S election is in effect exceeds that asset's adjusted basis on such date. Sec. 1374(d)(1). If an asset with built-in gain is sold during the 10-year period beginning on such date, the S corporation will be taxed on the built-in gain. Sec. 1374(a), (d)(7).

The parties agree that petitioner is subject to built-in gains tax under section 1374 on the sale of the CRC interest. Respondent asserts that the fair market value of the CRC interest on the valuation date was $5,220,423, the price for which the interest was sold to BellSouth on November 27, 2000. Petitioner contends that the value of the CRC interest on the valuation date was $2,980,000.

B.    Fair Market Value Standard

The standard for valuation is fair market value, which is defined as the price that a willing buyer would pay a willing seller, both persons having reasonable knowledge of all relevant facts and neither person being under a compulsion to buy or to sell.  See United States v. Cartwright, 411 U.S. 546, 551 (1973) (applying the standard set forth in section 20.2031-1(b), Estate Tax Regs.).  The standard is objective, using a hypothetical willing buyer and seller who are presumed to be dedicated to achieving maximum economic advantage in any transaction involving the property.  See Estate of Newhouse v. Commissioner, 94 T.C. 193, 218 (1990).  The objective willing buyer, willing seller standard  must be achieved in the context of market and economic conditions  on the valuation date.  Id.

The valuation of stock is a question of fact resolved on the basis of the entire record.  See Ahmanson Found. v. United States, 674 F.2d 761, 769 (9th Cir. 1981); Estate of Newhouse v. Commissioner, supra at 217.  The trier of fact must weigh all relevant evidence to draw the appropriate inferences.  See Commissioner v. Scottish Am. Inv. Co., 323 U.S. 119, 123-125 (1944); Helvering v. Nat. Grocery Co., 304 U.S. 282, 294-295 (1938); Estate of Newhouse v. Commissioner, supra at 217.

In valuing unlisted securities, "actual arm's length sales of such stock in the normal course of business within a

reasonable time before or after the valuation date are the best criteria of market value". Estate of Andrews v. Commissioner, 79 T.C. 938, 940 (1982); See also Estate of Davis v. Commissioner, 110 T.C. 530, 535 (1998). Where the value of unlisted stock cannot be determined from actual sale prices, its value generally is to be determined by taking into consideration a host of factors, including, among others, the company's net worth, prospective earning power, and dividend-paying capacity. See, e.g., Estate of Davis v. Commissioner, supra at 536.

As is customary in valuation cases, the parties offered expert opinion evidence to support their opposing valuation positions. In such cases, we evaluate the opinions of experts in the light of the demonstrated qualifications of each expert and all other evidence in the record. See Estate of Christ v. Commissioner, 480 F.2d 171, 174 (9th Cir. 1973), affg. 54 T.C. 493 (1970); Parker v. Commissioner, 86 T.C. 547, 561 (1986). We have broad discretion to evaluate "'the overall cogency of each expert's analysis.'" Sammons v. Commissioner, 838 F.2d 330, 334 (9th Cir. 1988) (quoting Ebben v. Commissioner, 783 F.2d 906, 909 (9th Cir. 1986), affg. in part and revg. in part T.C. Memo. 1983-200), affg. in part and revg. in part on another ground T.C. Memo. 1986-318.

We are not bound by the formulas and opinions proffered by an expert witness and may accept or reject expert testimony in

the exercise of sound judgment.  See <u>Helvering v. Nat. Grocery Co.</u>, <u>supra</u> at 295; <u>Estate of Newhouse v. Commissioner</u>, <u>supra</u> at 217.  Where necessary, we may reach a determination of value on the basis of our own examination of the evidence in the record.  See <u>Silverman v. Commissioner</u>, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285; <u>Estate of Davis v. Commissioner</u>, <u>supra</u> at 538.  Where experts offer divergent estimates of fair market value, we decide what weight to give these estimates by examining the factors they used in arriving at their conclusions.  See <u>Casey v. Commissioner</u>, 38 T.C. 357, 381 (1962).

We have broad discretion in selecting valuation methods, see <u>Estate of O'Connell v. Commissioner</u>, 640 F.2d 249, 251 (9th Cir. 1981), affg. on this issue and revg. in part T.C. Memo. 1978-191, and in evaluating the weight to be given the facts in reaching our conclusion because "finding market value is, after all, something for judgment, experience, and reason", <u>Colonial Fabrics, Inc. v. Commissioner</u>, 202 F.2d 105, 107 (2d Cir. 1953), affg. a Memorandum Opinion of this Court.  Moreover, while we may accept the opinion of an expert in its entirety, see <u>Buffalo Tool & Die Manufacturing Co. v. Commissioner</u>, 74 T.C. 441, 452 (1980), we may be selective in the use of any part of such opinion, or reject the opinion in its entirety, see <u>Parker v. Commissioner</u>, <u>supra</u> at 561.  Because valuation necessarily results in an approximation, the figure at which this Court arrives need not be

one as to which there is specific testimony if it is within the range of values that may properly be arrived at from consideration of all the evidence.  See <u>Estate of O'Connell v. Commissioner</u>, <u>supra</u> at 252; <u>Silverman v. Commissioner</u>, <u>supra</u> at 933.

C.    <u>The Parties' Expert Testimony</u>

Petitioner's expert witness, William E. King (Mr. King), prepared a report (King report) that concludes that the value of the CRC interest was $2,980,000 on the valuation date. Respondent's expert witness, Steven C. Hastings (Mr. Hastings), prepared a report (Hastings report) that concludes that the value of the CRC interest was $5,155,000 on the valuation date.

Mr. King is a certified public accountant and is accredited in business valuation by the American Institute of Certified Public Accountants.  Mr. King has substantial experience in valuing telecommunications entities.  Since 1998 Mr. King's work has been focused on the telecommunications industry, and Mr. King's company provides, on average, between 35 and 45 valuations per year related to telecommunications businesses.  Mr. King testified that in any given year he spends between 25 percent and 75 percent of his time working on telecommunications valuations. On the basis of his experience in telecommunications valuation, Mr. King was able to factor in the specific conditions and

outlook of the telecommunications industry, as well as the economic outlook in general, existing on the valuation date.

Mr. Hastings is a certified public accountant but is not accredited specifically in business valuation. Mr. Hastings worked in the area of business valuation during the late 1980s and early 1990s before leaving to work in other areas of finance. Mr. Hastings returned to business valuation work in 2006, and he testified that about 95 percent of his billable hours are currently spent on valuation issues. However, Mr. Hastings had never valued a telecommunications company before preparing his expert report in the instant case. Consequently, Mr. Hastings took a more mechanical approach to the valuation of the CRC interest, relying heavily on historical data without significant adjustment to reflect prevailing market conditions in the telecommunications industry on the valuation date.

Mr. King valued the CRC interest using both a business enterprise value analysis and a distribution yield analysis. The business enterprise value analysis incorporated four valuation methods (capitalization of income method, discounted future income method, guideline company method, and guideline transaction method). The capitalization of income method applied a capitalization rate of 13.6 percent to CHAT's determined net cashflows for four distinct periods preceding the valuation date. The discounted future income method applied discount rates

ranging from 14.33 percent to 17.03 percent to CHAT's projected annual net cashflows for each of the years during a 10-year period ending on December 31, 2009, and a 17.03-percent discount rate to CHAT's residual value. The guideline company method reflected prices paid for companies similar to CHAT and whose stock was traded in a public market. The guideline transaction analysis reflected transactions involving the acquisition of privately held entities similar to CHAT. The resulting values derived under these four enterprise valuation methods, and the weights assigned to each, were as follows:

| Method | Value of CHAT | Weight (percentage) |
|---|---|---|
| Capitalization of income | $44,902,000 | 50 |
| Discounted future income | 34,516,000 | 30 |
| Guideline company | 32,471,000 | 10 |
| Guideline transaction | 26,528,000 | 10 |
| Concluded enterprise value | 38,735,000 | |

On the basis of the above, Mr. King determined in his report that, on the valuation date, the total business enterprise value of CHAT was $38,735,000, the fair market value of CRC's interest in CHAT was $11,442,000, and the fair market value of the CRC interest was $2,861,000. In his report, Mr. King then applied a 5-percent lack of marketability discount and concluded that the appropriate business enterprise valuation of the CRC interest was $2,718,000.

Using the distribution yield analysis, Mr. King estimated the value of CHAT by applying a capitalization factor of 12.41 percent that reflected a 5-percent marketability discount to CHAT's net after-tax distributions for the 3 years before the valuation date (1997 through 1999). On the basis of the distribution yield analysis, Mr. King determined that the fair market value of the CRC interest on the valuation date was $3,243,000. In his report, Mr. King weighted the business enterprise analysis and the distribution yield analysis equally to arrive at a fair market value of $2,980,000 for the CRC interest.

In his report, Mr. Hastings valued the CRC interest by considering three business enterprise valuation methods (discounted cashflow method, merger and acquisition method, and guideline company method) to determine the fair market value of CHAT. Using the discounted cashflow method, Mr. Hastings applied a 14-percent discount rate to CHAT's projected annual income for each of the years during a 10-year period ending on December 31, 2009. Mr. Hastings used the merger and acquisition method to reflect transactions involving acquisitions of privately held entities comparable to CHAT. Mr. Hastings used the guideline company method to reflect prices paid for companies which were engaged in a business similar to CHAT and whose stock was publicly traded. In his report, Mr. Hastings determined that the

guideline company method potentially overstated the value of CHAT and gave it no weight. Mr. Hastings concluded that the discounted cashflow method and the merger and acquisition method should be weighted equally. The resulting values derived under these three methods were as follows:

| Valuation Method | Value of CHAT | Weight (percentage) |
|---|---|---|
| Discounted cashflow | $98,900,000 | 50 |
| Merger & acquisition | 115,900,000 | 50 |
| Guideline company | 127,800,000 | 0 |
| Concluded value | 107,400,000 | |

On the basis of the above, Mr. Hastings, in his report, determined that the total value of CHAT was $107,400,000, applied a 35-percent marketability discount, and concluded that the value of a 7.385-percent equity interest in CHAT on January 1, 2000, was $5,155,000. He also concluded that a multilevel discount was not appropriate and concluded that the value of the CRC interest on the valuation date was $5,155,000.

In his report, Mr. Hastings did not consider CHAT's distribution history when preparing his valuation analysis, and respondent asserts that Mr. King's use of a distribution yield analysis in his report was inappropriate. Specifically, respondent contends that a distribution yield analysis is appropriate only where the company being valued has been distributing almost all of its net income. Relying on section

25.2512-2(f)(2), Gift Tax Regs., and Rev. Rul. 59-60, 1959-1 C.B. 237, respondent further asserts that dividend-paying capacity, not dividends paid or distributed, should be used to value closely held stock. Respondent contends that a distribution yield analysis will understate the value of a company's stock when the company is not paying out all of the cash that it has available for dividends. It is important to note that while dividend-paying capacity may well be more important than actual dividends paid or distributed when determining the value of a controlling interest in a closely held business, this Court has recognized that "Dividends paid can be more important than dividend-paying capacity in appraising minority interests because a minority shareholder cannot force the company to pay dividends even if it has the capacity to do so". Barnes v. Commissioner, T.C. Memo. 1998-413 (citing Pratt, et al., Valuing a Business: The Analysis and Appraisal of Closely Held Companies 227 (3d ed. 1996)).

D. Sale Price of the CRC Interest as Evidence of Fair Market Value

Since a reasonably contemporaneous arm's-length sale is the best evidence of value, we must decide whether the sale of the CRC interest to BellSouth meets that criterion. During July 2000, approximately 6 months after the valuation date, petitioner and BellSouth entered into an agreement for the purchase of the CRC interest. Petitioner sold the CRC interest to BellSouth on

November 27, 2000, for $5,220,043. Respondent contends that the best evidence of the value of the CRC interest on January 1, 2000, is the subsequent sale of that interest to BellSouth on November 27, 2000. Petitioner contends that the sale of the CRC interest to BellSouth did not reflect arm's-length pricing between a willing and informed hypothetical buyer and seller and that the sale price must be disregarded or adjusted. Petitioner further contends that BellSouth would have paid more than an average hypothetical buyer for the CRC interest because BellSouth already owned a controlling interest in CHAT, the primary asset of CRC.

In deciding whether the sale of the CRC interest to BellSouth is probative evidence of its value on the valuation date, we first consider whether the sale was within a reasonable time after the valuation date. The price at which the CRC interest sold was fixed by a formula agreed to 6 months after the valuation date. Petitioner has not established, and does not argue, that there were intervening circumstances that would have affected value between the valuation date and the sale date, and neither party asserts that the sale date was not within a reasonable time after the valuation date. We conclude, on the basis of the record, that the sale of the CRC interest to BellSouth occurred within a reasonable time after the valuation

date and that there were no intervening events that would have affected value between the valuation date and the sale date.

We next consider whether the sale to BellSouth was an arm's-length sale in the normal course of business. The evidence indicates that BellSouth was an unrelated buyer acting in its own self-interest when it purchased the CRC interest. Neither party argues that the sale to BellSouth was not an arm's-length transaction. We conclude, on the basis of the record, that the sale of the CRC interest was an arm's-length sale in the normal course of business.

Finally, even though we have concluded that the sale of the CRC interest to BellSouth was an arm's-length transaction, we consider whether unique characteristics of the transaction persuade us to adjust the sale price in our valuation analysis. Petitioner argues that if we use the BellSouth purchase price as evidence of the value of the CRC interest on the valuation date, that purchase price must be adjusted to reflect "special circumstances surrounding the buyer, the seller, or the transaction generally that could have skewed the sale price from a measure of true fair market value that would have been reached between a hypothetical buyer and seller absent those circumstances". We agree with petitioner that in the instant case we should consider the unique characteristics of the actual buyer, seller, and transaction. See Epic Associates 84-III v.

Commissioner, T.C. Memo. 2001-64; Hansen v. Commissioner, a Memorandum Opinion of this Court dated July 28, 1952; sec. 20.2031-2(e), Estate Tax Regs.

Petitioner contends that the sale price must be adjusted because "BellSouth was a truly unique buyer that would have likely valued the CRC interest at a higher price than literally anyone else in the world based on its unilateral control of CHAT". Additionally, petitioner contends that we must consider BellSouth's history of submitting "high bids" in order to discourage exercise of rights of first refusal.

E.  Whether the BellSouth Sale Price Included a Control Premium

Petitioner argues that, as a matter of law, the fair market value of a minority interest in a business cannot be ascertained by reference to what a controlling interest holder would pay for the interest because a controlling interest holder would place a greater value on a minority interest than would a hypothetical purchaser who lacks control. Petitioner therefore contends that the BellSouth purchase price reflects a "control" value to BellSouth and must be disregarded or discounted in determining the fair market value of the CRC interest to a hypothetical buyer who did not control CHAT as BellSouth did.

Respondent counters with the argument that BellSouth already controlled CHAT before its acquisition of the CRC interest and did not gain any additional measure of control over CHAT by

virtue of its purchase of the CRC interest.  Consequently, respondent contends, BellSouth would not have paid a control premium for the CRC interest but instead would have paid only what any other buyer would have paid for a minority interest in CRC.  Respondent, therefore, argues that the BellSouth sale price reflects a discount for lack of control.

According to petitioner, valuing the CRC interest by reference to the BellSouth sale price, without applying a discount for lack of control, would violate the precedent of this Court and the Court of Appeals for the Eleventh Circuit.[3] Petitioner contends that Estate of Bright v. Commissioner, 658 F.2d 999 (5th Cir. 1981) (en banc),[4] and Estate of Andrews v. Commissioner, 79 T.C. 938 (1982), prohibit the Commissioner from valuing an interest on the basis of its value to a person who

---

[3]The Tax Court follows the law of the Court of Appeals to which an appeal would lie if the law of that circuit is on "all fours".  Golsen v. Commissioner, 54 T.C. 742, 757 (1970), affd. 445 F.2d 985 (10th Cir. 1971).  Absent stipulation to the contrary, any appeal of the instant case would be to the Court of Appeals for the Eleventh Circuit.  See sec. 7482(b)(1)(B).

[4]The Court of Appeals for the Eleventh Circuit has adopted as binding precedent certain decisions of the former Court of Appeals for the Fifth Circuit.  See Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc); Stein v. Reynolds Sec., Inc., 667 F.2d 33 (11th Cir. 1982).  However, as discussed below, because Estate of Bright v. Commissioner, 658 F.2d 999 (5th Cir. 1981), is not on "all fours" with the instant case, we need not consider whether it would be binding precedent in the Eleventh Circuit.

already holds a controlling interest without applying a discount for lack of control.

In Estate of Bright, the decedent and her husband owned, as community property, a 55-percent interest in each of several closely held corporations. The issue in Estate of Bright was the valuation of the decedent's one-half of that community property interest. The Commissioner argued that the proper valuation method was to value the entire 55-percent interest, including a control premium, and then take one-half thereof. The Court of Appeals for the Fifth Circuit held that family attribution did not apply to lump the decedent's minority interest with the interest of her husband to create a controlling interest for valuation purposes. Id.

In Estate of Andrews v. Commissioner, supra, the issue was the valuation of a decedent's 20-percent interest in each of four closely held corporations. As there had been no sales of interests in the corporations being valued within a reasonable time before or after the valuation date, this Court valued the stocks indirectly by weighing net worth, prospective earning power, dividend-paying capacity, and other relevant factors. Id. at 940. The portion of the Estate of Andrews Opinion on which petitioner relies addresses whether a control discount should be applied to that indirectly determined value. Id. at 951. The Commissioner's position in Estate of Andrews was that a control

discount should not be applied if family members control a corporation. Id. at 952. Because all the shareholders, including the decedent, were family members and shared in control, the Commissioner argued that no discount should be allowed in valuing the decedent's 20-percent interest. Id. Citing Estate of Bright v. Commissioner, supra, this Court rejected the family attribution argument and applied a minority discount in determining the value of the decedent's minority interests. Id. at 956.

We do not agree that either Estate of Bright or Estate of Andrews controls the valuation issue in the instant case as a matter of law. In both Estate of Bright and Estate of Andrews, the question was not whether a majority shareholder would pay a premium for a minority interest in an entity that it controlled but whether family attribution should apply to prevent the application of a lack of control discount even though the interest being valued was a minority interest. Neither Estate of Andrews nor Estate of Bright involved an actual, contemporaneous sale of an interest in any of the entities being valued as is present in the instant case. In both Estate of Bright and Estate of Andrews, the Commissioner's position was that a minority interest in a closely held corporation should be valued with a control premium. Those are not the circumstances of the instant case. Respondent concedes that the CRC interest was a minority

interest and that a minority discount is appropriate in valuing that interest.[5] As discussed above, respondent contends that the minority discount is reflected in the BellSouth sale price.

For the foregoing reasons, we conclude that neither Estate of Bright v. Commissioner, supra, nor Estate of Andrews v. Commissioner, supra, establishes that a controlling shareholder would necessarily be willing to pay a premium for a minority interest in a corporation that it already controlled. Accordingly, we do not agree with petitioner that we must, as a matter of law, apply a lack of control discount to the actual sale price of the CRC interest because the buyer, BellSouth, controlled CHAT.

We next consider whether petitioner has proved that, under the particular circumstances present, the CRC interest would have been more valuable to BellSouth than to another investor who was merely acquiring a minority interest. We find nothing in the record to support petitioner's assertion. To the contrary, petitioner's own expert, Mr. King, indicated that BellSouth had no incentive, from a control perspective, to buy the CRC interest. Mr. King testified at trial that "it's already been indicated that BellSouth had no reason to buy this. There was no control element that * * * was associated with this." He further

_____

[5]The parties disagree as to what the appropriate minority discount is and as to when and how that discount should be reflected in the different valuation methodologies.

stated that "there's no reason for it, they already had control. They already had operating control of the partnership." Accordingly, we conclude that petitioner has not established that BellSouth paid a control premium for the CRC interest.

F.    Whether Rights of First Refusal Affected the Sale Price

We next consider whether, as petitioner contends, there is evidence that BellSouth paid a premium for the CRC interest in order to discourage the exercise by the other CRC partners of their rights of first refusal.  The sale of the CRC interest was subject to a right of first refusal in favor of the three nonselling partners of CRC.  Mr. King testified that, in his extensive prior experience dealing with BellSouth and its successor entities, once BellSouth determines that a transaction is strategic it will "do whatever it takes to win" including submitting high bids to discourage exercise of rights of first refusal.  Regarding the CRC purchase, Mr. King stated that "In other words, they wanted to make sure that they put an offer out that was sufficient enough to essentially discourage Bledsoe Telephone Company and Trenton Telephone Company from exercising their right of first refusal."

We found Mr. King's testimony to be credible, and there is no evidence contradicting his testimony in that regard. Consequently, we conclude that the BellSouth sale price should be adjusted to reflect the likelihood that BellSouth viewed the CRC

interest as a strategic acquisition and was willing to pay a premium to avoid exercise of the rights of first refusal of the other CRC partners.  For the foregoing reasons, we conclude that the BellSouth sale price is probative, but not conclusive, evidence of the value of the CRC interest on the valuation date.

G.    Fair Market Value of the CRC Interest

Because we find that the BellSouth sale price is probative, but not conclusive, evidence of the value of the CRC interest on the valuation date, we have also carefully considered all of the other evidence in the record in arriving at a determination of the fair market value of the CRC interest.  In making a determination of value, we have considered the sale of the CRC interest to BellSouth and the valuation reports of Mr. King and Mr. Hastings, as well as all the other relevant factors, including the unique characteristics of BellSouth as a purchaser, the business climate on the valuation date, the double-tiered partnership structure, and the dividend and capital call history of CRC.

We found petitioner's expert, Mr. King, to be the more persuasive of the two expert witnesses.  As discussed above, his experience in the field of telecommunications valuation allowed him to tailor his analyses to reflect industry conditions existing on the valuation date.  Additionally, Mr. King's analysis considered the distribution history of CHAT, a factor

ignored by Mr. Hastings but likely to be an important consideration for a purchaser of a minority interest. Finally, the Court found Mr. King's testimony at trial to be credible and persuasive. Accordingly, we place great weight on Mr. King's expert report. However, we do believe that Mr. King failed to adequately consider the sale to BellSouth in his analysis, and we take that sale into account in reaching a determination of value.

We accept the values determined by Mr. King in his business enterprise valuation analysis and his distribution yield analysis and his decision to weight those factors equally in valuing the CRC interest. However, we have also determined that it is appropriate to include a third factor in the analysis; i.e., the BellSouth sale price. After considering all of the evidence in the record, we conclude that the values yielded by the business enterprise analysis ($2,718,000), the distribution yield analysis ($3,243,000), and the BellSouth sale price ($5,220,423) should be weighted equally in arriving at the value of the CRC interest. Weighting each of those numbers equally results in a value of $3,727,141. On the basis of the foregoing considerations and the entire record, we conclude that the fair market of the CRC interest as of the valuation date was $3,727,142.

## II. Substantial Understatement Penalty

A taxpayer may be subject to an accuracy-related penalty of 20 percent of any underpayment which is attributable to a substantial understatement of income tax. Sec. 6662(a) and (b)(2). For an S corporation, there is a substantial understatement of income tax if the amount of the understatement for the tax year exceeds the greater of 10 percent of the amount required to be shown on the return or $5,000. Sec. 6662(d)(1)(A). Pursuant to section 7491(c), the Commissioner generally bears the burden of production for any penalty, but the taxpayer bears the ultimate burden of proof. Higbee v. Commissioner, 116 T.C. 438, 446 (2001).

The accuracy-related penalty does not apply where it is shown that there was substantial authority for the position taken by the taxpayer. Sec. 6662(d)(2)(B)(i). The accuracy-related penalty also does not apply to any part of an underpayment of tax if it is shown that the taxpayer acted with reasonable cause and in good faith. Sec. 6664(c)(1). That determination is made on a case-by-case basis, taking into account all the pertinent facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs. Taxpayers bear the burden of proving that they had reasonable cause and acted in good faith. See Higbee v. Commissioner, supra at 446; Dollander v. Commissioner, T.C. Memo. 2009-187. Relevant factors include a taxpayer's efforts to assess his proper tax

liability, including the taxpayer's reasonable and good-faith reliance on the advice of a professional such as an accountant. Sec. 1.6664-4(b)(1), Income Tax Regs.

Respondent determined that petitioner is liable for a substantial understatement penalty pursuant to section 6662 of $185,052. Because we conclude below that petitioner acted with reasonable cause and in good faith, it is unnecessary to determine the precise amount of the understatement resulting from our determination of the value of the CRC interest.

Petitioner contends that it is not liable for an accuracy-related penalty because it acted in good faith and reasonably relied on the advice of Mr. Henley in reporting the value of the CRC interest. Respondent asserts that petitioner did not act reasonably and in good faith because it disregarded two appraisals and the actual sale price, all of which would have resulted in a value for the CRC interest higher than that which was reported on petitioner's 2000 income tax return.

Mr. Erli, who was petitioner's general manager in 2000, testified that he was not an expert in tax matters, and that, in fact, tax was one of his areas of weakness. For that reason, Mr. Erli suggested that petitioner should bring in someone to consult on its tax returns. Consequently, Mr. Henley, a certified public accountant specializing in tax, was hired to review petitioner's tax returns. It was Mr. Henley who first raised the issue of

built-in gains tax.  Mr. Erli's uncontradicted testimony establishes that the decision to use the $2.6 million valuation of the CRC interest from the February 2000 report was based on the advice of Mr. Henley.  We conclude that it was reasonable for petitioner to rely on the advice of Mr. Henley in determining the valuation of the CRC interest to report on its income tax return

Mr. Henley testified that he was made aware of the sale to BellSouth, but that he did not recommend that petitioner use the sale price in determining the value of the CRC interest on the valuation date.  On the basis of the testimony of Mr. Erli and Mr. Henley, it appears that petitioner did not provide Mr. Henley with the September 1999 report or the Robinson-Humphrey memorandum.  All of the evidence indicates that the February 2000 report was an update of the September 1999 report to correct errors and incorporate more current data.  Respondent does not dispute that the September report contained errors, nor does respondent contend that the February 2000 report did anything more than correct errors and incorporate more recent financial information.  We conclude that there was no reason for petitioner to have provided Mr. Henley with an appraisal that contained errors and outdated financial information when a more current version of that same report was available.  Furthermore, we conclude that the Robinson-Humphrey memorandum was prepared primarily as a marketing tool, not as an objective valuation of

the CRC interest. Consequently, we conclude that petitioner did not act in bad faith when it failed to provide Mr. Henley with the September 1999 report and the Robinson-Humphrey memorandum.

For the foregoing reasons we conclude that petitioner acted with reasonable cause and in good faith in relying on the advice of Mr. Henley regarding the valuation of the CRC interest. Because we so conclude, we need not reach the question of whether petitioner's position was supported by substantial authority. We hold that petitioner is not liable for a substantial understatement penalty under section 6662.

III. <u>Conclusion</u>

On the basis of the foregoing, we conclude that the value of the CRC interest on January 1, 2000, was $3,727,142 and that petitioner is not liable for a substantial understatement penalty.

We have considered all of the contentions and arguments of the parties that are not discussed herein, and we find them to be without merit, irrelevant, or moot.

To reflect the foregoing,

<u>Decision will be entered under Rule 155</u>.